**PRODUCTS LIABILITY INSURANCE AGENCY, INC., Plaintiff-Appellant,**

v.

**CRUM & FORSTER INSURANCE COMPANIES a/k/a United States Fire Insurance Company, et al., Defendants-Appellees.**

No. 81–2616.

United States Court of Appeals, Seventh Circuit.

Argued May 11, 1982.

Decided June 28, 1982.

lis, Victor G. Savikas, Karon, Morrison & Savikas, Ltd., Chicago, Ill., for defendants-appellees.

Before POSNER, Circuit Judge, DAVIS,* Associate Judge, and COFFEY, Circuit Judge.

POSNER, Circuit Judge.

The complaint in this antitrust case, which was dismissed below on the defendants' motion for summary judgment after pretrial discovery had been completed, alleges a collective refusal to deal ("boycott") in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, which forbids agreements in restraint of trade. The plaintiff is a corporation owned and operated by an Illinois lawyer named Byron Getzoff, and since, at least so far as the issues in this case are concerned, it has no existence apart from Getzoff, we shall treat him as the plaintiff to make our opinion simpler. Also, although there are numerous defendants, we need mention only two—Crum & Forster Insurance Companies, which the parties treat as a single entity though in fact it is a group of affiliated corporations; and Paris, O'Day & Reed, Inc., an insurance agency.

Getzoff was a trial lawyer who had long specialized in defending ladder manufacturers against product liability claims. He was also an insurance broker who, working through Paris, had procured product liability insurance for the ladder manufacturers, first from the Kemper group of insurance companies, then from Crum & Forster. Paris split its commissions on this insurance with Getzoff, whose share in 1976 exceeded $100,000. Getzoff was at the same time the lead attorney handling product liability claims for Crum & Forster.

Crum & Forster was unaware of Getzoff's activities as a broker until Getzoff, who had had a falling out with Paris, wrote a letter to Crum & Forster on August 30, 1976, that began: "I am better known at Crum and Forster's claim department in my

Robert Plotkin, Plotkin & Jacobs, Ltd., Chicago, Ill., for plaintiff-appellant.

Samuel Weisbard, McDermott, Will & Emery, MaryAnn C. Hayes, Kirkland & El-

* Of the United States Court of Claims.

role as lead counsel on ladder product liability cases. But [at] this time I would like to disclose another role that I play in this program as the producing agent under the corporate name of Product Liability Insurance Agency." The letter went on to disparage Paris's contribution to the insurance program, to describe product liability insurance for ladder manufacturers as "the captive market that I [Getzoff] have developed," to inform Crum & Forster that Getzoff had requested each of the manufacturers to designate him as its exclusive broker for such insurance, and to request "an immediate meeting so that an orderly transfer of this account can be made from Paris, O'Day & Reed to this office."

In the weeks that followed, brokerage designations flowed in to Getzoff from the ladder manufacturers. But on September 20 Crum & Forster, responding to Getzoff's letter, stated in a roundabout but nonetheless unmistakable fashion that it would not appoint him an agent of the company. This meant that as broker he would be acting strictly on behalf of the manufacturers— that is, as an intermediary between the manufacturers and Paris, rather than between the manufacturers and Crum & Forster as they and he had intended when they had designated him as their exclusive broker. Crum & Forster conveyed the bad news to the manufacturers, and by November 1976 most of them had revoked their designations of Getzoff. On November 8, 1976, Crum & Forster terminated Getzoff's legal services. The complaint does not question the lawfulness of that termination; it alleges a conspiracy between Crum & Forster and Paris to exclude Getzoff from the business of product liability insurance for ladder manufacturers.

■ In concluding that Getzoff had not presented enough evidence of conspiracy to resist the defendants' motion for summary judgment, the district court gave more weight than we would be inclined to give to denials contained in the affidavits of two employees of Crum & Forster. One affidavit stated that Crum & Forster's refusal to appoint Getzoff an agent was "solely the unilateral decision of [Crum & Forster] made in response to the confusion of the ladder manufacturers brought about by the Getzoff-Paris dispute. Crum & Forster never participated in any agreement with [Paris] to refuse to deal with [Getzoff]." The other affidavit stated: "All of the steps taken by Crum & Forster in response to the confusion generated by the Getzoff-Paris dispute were entirely the result of its own independent decision. Crum & Forster never engaged in any agreement with [Paris] to refuse to deal with [Getzoff]." Conclusional denials of conspiracy in affidavits obviously drafted by lawyers are entitled to little weight in deciding whether to grant an antitrust defendant's motion for summary judgment.

But this does not mean that Getzoff is entitled to a trial. Pretrial discovery yielded no evidence of an agreement between Paris and Crum & Forster to deny a role to Getzoff in the ladder manufacturers' insurance program. True, there were frequent communications between Paris and Crum & Forster prior to the September 20 letter that was the immediate cause of Getzoff's exclusion from the program, but there is no evidence that these communications included requests by Paris to exclude Getzoff or that Crum & Forster's actions were in response to such requests. The evidence gathered in pretrial discovery actually rebuts any inference of conspiracy, even if we ignore the promptings of common sense and assume that Getzoff's "dual role," as his brief delicately describes it, had nothing to do with Crum & Forster's refusal to appoint him an insurance agent for the ladder program, though it is why Crum & Forster terminated his legal services. The affidavits do not state that Getzoff's dual role was the reason why he was not given the agency either in place of or in competition with Paris, and perhaps his rapport with the ladder manufacturers and his influence over their choice of insurers might have induced Crum & Forster, in other circumstances, to overlook Getzoff's conflict of interest, which could be and was eliminated by firing him as its claims counsel. But as the ladder program was nationwide and

Getzoff a licensed insurance broker only in Illinois, he was ineligible to be an insurance agent for Crum & Forster. He says that he could have gotten licensed in other states, and perhaps in time he could have; but in September 1976 he was not licensed in any other state, so we cannot understand how Crum & Forster could have been expected to appoint him an agent to compete with or replace Paris at that time.

█ If, after the completion of pretrial discovery, it is clear that the plaintiff will not be able to establish at trial an essential element of his claim, the defendant is entitled to have the complaint dismissed on summary judgment; a trial would be a waste of time. This is as true in an antitrust case as in any other type of case. See, e.g., *Weit v. Continental Ill. Nat'l Bank & Trust Co.*, 641 F.2d 457, 464 (7th Cir. 1981). It is clear that the plaintiff in this case will not be able to prove that his exclusion was the consequence of anything more than a unilateral act of Crum & Forster; and if that is all there was, there was no conspiracy, and hence no violation of section 1.

█ But even if we are wrong and a conspiracy between Paris and Crum & Forster to exclude Getzoff from becoming an insurance agent for the ladder program could somehow be teased out of the depositions and affidavits, summary judgment for the defendants was proper because no evidence gathered in the course of pretrial discovery points to a conspiracy in restraint of trade. To prove that a conspiracy or other form of agreement violates section 1 of the Sherman Act, the plaintiff must show either that it falls in one of the categories of "per se" illegality or that it has an actual or at least probable anticompetitive effect. Agreements that are illegal per se are for the most part horizontal, that is, between competing sellers, which Crum & Forster and Paris are not. The former is an insurance underwriter, the latter an insurance agent. Their relationship is "vertical"—analogous to that between a manufacturer and his distributor. If multiple manufacturers or multiple distributors were involved, the agreement would have an ad-

mixture of the horizontal, as in *Com-Tel, Inc. v. DuKane Corp.*, 669 F.2d 404, 412–13 (6th Cir. 1982), but there is nothing of that sort here.

█ Vertical agreements are illegal per se only if their purpose is price fixing. Thus, if Paris and Crum & Forster had conspired to exclude Getzoff in order to increase the price of insurance, then *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979), which this court, in dictum, has indicated that it would follow if a similar case arose in this circuit, see *Alloy Int'l Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222, 1226 (7th Cir. 1980); *Contractor Util. Sales Co. v. Certain-Teed Prods. Corp.*, 638 F.2d 1061, 1072 n.9 (7th Cir. 1981), would be authority for holding that the defendants had committed a per se violation of section 1 of the Sherman Act by a form of vertical price fixing. But in the absence of any evidence of intent to raise prices—and there is no such evidence in this case—an agreement whereby a supplier of some good or service refuses, at the behest of one of his distributors, to deal with a competitor of that distributor is not illegal per se. To prevail in such a case the plaintiff must show that the refusal to deal is likely to reduce competition. See, e.g., *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133–34 (2d Cir. 1978) (*en banc*). So even if Paris had said to Crum & Forster, "it's Getzoff or me—you must choose between us," and Crum & Forster, knuckling under to the threat, had refused to appoint Getzoff as an insurance agent who would have competed with Paris, there would still be no violation of section 1 without some showing of an adverse effect on competition.

█ Now there is a sense in which eliminating even a single competitor reduces competition. But it is not the sense that is relevant in deciding whether the antitrust laws have been violated. Those laws, we have been told by the Supreme Court repeatedly in recent years, are designed to protect the consumer interest in competition. See, e.g., *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60

L.Ed.2d 931 (1979). The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality. It thus would not be enough to show that Crum & Forster excluded Getzoff because Paris wanted it to. Suppose for example that Paris had wanted to exclude Getzoff in retaliation for his August 30 letter to Crum & Forster in which he disparaged Paris's contribution to the ladder insurance program. No inference could be drawn that the result of excluding Getzoff under such circumstances would be to raise the price, or diminish the quality, of product liability insurance to the ladder industry.

We can imagine two possible theories of anticompetitive effect that Getzoff might have tried to establish. The first is that Paris was trying either to obtain or to hold on to a dominant position in the market for insurance agency services, by getting Crum & Forster to terminate a potential competitor of Paris, namely Getzoff. It is hard to see why Crum & Forster would cooperate in such a scheme of Paris's. It would not be in Crum & Forster's interest as a seller of insurance to have to deal with an agent who had a monopoly of agency services, since the agent could and presumably would use his monopoly to extract higher commissions from the seller. But in any event such a theory presupposes that Paris had a big enough position in the market for insurance agency services to have a realistic hope of obtaining at least some degree of monopoly power. The threshold issues would be what the relevant market was and what Paris's share of that market was. Cf. *Northwest Power Prods., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 90–91 (5th Cir. 1978); *U. S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 790 (7th Cir. 1981). Pretrial discovery produced no evidence on these questions.

An alternative theory, and the one emphasized by Getzoff, is that Crum & Forster was afraid that if Getzoff established himself as an insurance agent he would switch the ladder manufacturers—his "captive market," as he called it—to another insur-

ance company and Crum & Forster would lose that business. Under this theory Getzoff is a potential competitor of Crum & Forster rather than of Paris. But no evidence was presented in support of this theory either. And it is inconsistent with Getzoff's reference to his "captive market," which implies that Getzoff would have caused the ladder manufacturers to switch to another insurer not with the purpose or likely effect of giving them the benefits of competition but only to extract higher commissions for himself; we have difficulty seeing this as a competitive benefit.

Even if we dismiss the reference to the captive market as *braggadocio*, we would have to know something about the structure of the market, this time the insurance underwriting market, to determine whether Getzoff's exclusion was likely to impair competition. If Crum & Forster has plenty of competition, it is hard to see how the ladder manufacturers could be hurt by Getzoff's exclusion from the insurance agency business even if he would in fact have switched them to another insurance carrier: since competition would force Crum & Forster to offer them competitive terms, they would not have to switch in order to get the benefits of competition. No evidence was presented concerning the structure of the insurance underwriting market. We do not know Crum & Forster's market share or even whether the relevant market is all liability insurance, all product liability insurance, or just product liability insurance for the ladder industry. This theory fails at the threshold too.

Getzoff cites *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), for the proposition that, contrary to what we have said, he need not point to any evidence of an adverse effect on competition to withstand summary judgment against him. Klor's operated a retail store in competition with one of Broadway-Hale's department stores. The complaint alleged that Broadway-Hale had entered into a conspiracy with ten national manufacturers of appliances (and their distributors) whereby the manufactur-

ers and their distributors agreed not to sell appliances to Klor's, at least on terms comparable to those on which they sold to Broadway-Hale. On motion for summary judgment, the defendants submitted affidavits showing that there were hundreds of other appliance dealers—some within a few blocks of the plaintiff—selling the same brands of appliance that the manufacturer and distributor defendants refused to sell to the plaintiff. The district court granted the motion for summary judgment on the ground that the controversy was a "purely private quarrel" between Klor's and Broadway-Hale. The Supreme Court reversed. It held that the allegations of the complaint, if true, showed a boycott that violated section 1 of the Sherman Act and that was "not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy." *Id.* at 213, 79 S.Ct. at 710. Substitute Getzoff for Klor's, Paris for Broadway-Hale, and Crum & Forster for the ten national manufacturers and their distributors and you have—Getzoff argues—this case.

But the Court in *Klor's* distinguished the case of "a manufacturer and a dealer agreeing to an exclusive distributorship." *id.* at 212, 79 S.Ct. at 709, which is one way of describing an agreement (if, contrary to what we concluded earlier, there was an agreement) between Paris and Crum & Forster that Getzoff would not be allowed to compete with Paris as a Crum & Forster agent. The Court described the complaint as alleging, rather, "a wide combination consisting of manufacturers, distributors and a retailer ... [that] takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products." *Id.* at 213, 79 S.Ct. at 710. No "wide combination" is alleged here. It is not alleged that Crum & Forster combined with other insurance carriers to squeeze Getzoff out of the market. Nor is it alleged that Crum & Forster by itself had as much market power as the ten national manufacturers who combined in *Klor's* may be assumed to have had. Even if it did have that much

power, the antitrust laws have, as we said earlier, traditionally treated horizontal combinations, such as that among the ten manufacturers in *Klor's*, more harshly than vertical combinations, such as that between an insurance carrier and one of its agents.

*Klor's* in any event belongs to an era in the Supreme Court's antitrust jurisprudence when the Court was concerned with the welfare of individual competitors as well as with the health of the competitive process viewed as a means of protecting consumers. Yet even in *Klor's* the Court's ultimate concern was with the consumer, as shown by the fact that, after the remark that the boycott of Klor's was intolerable even if Klor's was so small that its destruction could make little difference to the economy, the Court explained in the next sentence, "Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups." *Id.* at 213, 79 S.Ct. at 710. There is no suggestion that if Crum & Forster is allowed to get away with excluding Getzoff, his exclusion will turn out to have been the first step in a march toward a monopoly in the insurance business. The horizontal combination in *Klor's* may have created some danger of eventual monopoly but no such combination is alleged in this case. This private squabble does not threaten consumers' welfare even remotely. If Getzoff thinks he is wronged he must look to state law for his remedy.

AFFIRMED.