**MARCO HOLDING COMPANY, an Illinois corporation, Plaintiff,**

v.

**LEAR SIEGLER, INC., a Delaware corporation, d/b/a National Twist Drill & Tool Company; Chicago Hi-Speed Tool Company and Supply, an Illinois corporation; Serson Supply Inc., an Illinois corporation, Defendants.**

**No. 82 C 4417.**

United States District Court, N.D. Illinois, E.D.

Feb. 14, 1985.

Nathan H. Lichtenstein, Greenberg, Keele, Lunn & Aronberg, Robert S. Atkins, Robert E. Williams, Robert S. Atkins & Assoc., Chicago, Ill., for plaintiff.

Ronald Butler, James Rubin, Brigett Bell, Butler, Rubin, Newcomer, Saltarelli & Boyd, Chicago, Ill., for Serson Supply.

Marc A. Primack, Alan S. Ganz, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Lear Siegler.

Loren J. Mallon, Roy L. Bernstein, Gottlieb & Schwartz, Chicago, Ill., for Chicago Hi-Speed.

## MEMORANDUM OPINION

WILL, District Judge.

Before us in this heavily litigated case are (1) defendants', Lear Siegler, Inc. (Lear Siegler), Chicago Hi-Speed Tool Company and Supply, Inc. (Chicago Hi-Speed), and Serson Supply, Inc. (Serson Supply), motion for summary judgment on count III of Marco Holding Company's (Marco) third amended complaint, alleging a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, and (2) Marco's motion under Fed.R.Civ.P. 12(f) to strike count II of Lear Siegler's counterclaim, alleging "fraudulent and deceitful misrepresentation" and its first and second affirmative defenses or, alternatively, for summary judgment, Fed.R.Civ.P. 56, and for sanctions under Fed.R.Civ.P. 11. For the reasons hereinafter stated we (1) deny Lear Siegler's motion for summary judgment on count III of the third amended complaint and deny plaintiff's request for sanctions and (2) grant Marco's motion for summary judgment on Lear Siegler's counterclaim, and first and second affirmative defenses, but deny its request for sanctions, fees and expenses with regard to this particular motion.

In addition to the pleadings on the motions before us, the voluminous record includes many exhibits and extensive deposition testimony of the following persons involved in this litigation: William S. Lazich (Lazich), currently division president of National Twist Drill & Tool Company (National Twist); Charles A. Kremser (Kremser), vice president of sales of National Twist; Robert D. Pedigree (Pedigree), one of three regional sales managers of National Twist; Wilfred A. Ferzacca (Ferzacca), another regional sales manager of National Twist; Leon Rosen (Rosen), president of Chicago Hi-Speed; John J. Serson (Serson), president of Serson Supply; Wesley Barnes (Barnes), vice president of Serson Supply; Mark Douglas Friefeld (Friefeld), president of Manufacturers' Industrial Suppliers Corporation (MIS) during the relevant time period; Barry R. Friefeld, of Field Tool Supply Co. (Field Tool); Sidney Friefeld, co-owner with Edward Friefeld of MIS and Field Tool; Samuel A. Robbins (Robbins), certified public accountant and accountant for MIS and Field Tool; and Robert E. Templeton (Templeton), salesman for National Twist. Many of these persons have been deposed, redeposed and deposed yet again. Additionally, the record also includes affidavits from some of the above-named gentlemen.

From the above, we have determined that the following facts, relevant to the motions before us, are, apparently, not disputed. Lear Siegler, through its National Twist division, manufactures cutting tools, including end mills, drills, and taps. It sells them under various brand names, including "National", "Standard", and "Max-Line". Apparently, the items are substantially identical, although they are put into different packages and the Max-Line brand tools are less expensive than the National and Standard brands. The industry generally perceives the Max-Line brand to be inferior to National and Standard. Max-Line does not have the "image" that National has. Lazich Dep. at 169 (July 23, 1983)[1] Lear Siegler sells the cutting tools

1. Because of the multiple depositions taken of several persons involved in this case, for the

through a network of distributors, some of whom sell to other distributors, while others sell to end users.

In August, 1976, Lear Siegler made Serson Supply a master distributor of the National brand; it had previously been a Standard distributor. (A "master distributor" is one who sells solely to other distributors and not to end-users or consuming accounts.) Lear Siegler also made Chicago Hi-Speed a master distributor of Standard. In 1981 and 1982, Serson Supply and Chicago Hi-Speed were "considered good dollar volume" distributors and the largest distributors in the Chicago metropolitan area. Kremser Dep. at 229–230 (Dec. 6, 1984).

In June, 1981, Ferzacca, sales manager for Lear Siegler's Chicago area region, contacted MIS concerning the possibility that MIS become a distributor of Lear Siegler cutting tools. Ferzacca was interested in MIS, as he understood it sold to small distributors and Lear Siegler was interested in having such a distributor. Lear Siegler was losing small orders and needed an aggressive master distributor. Ferzacca Dep. at 25 (Mar. 23, 1983); Pl.Ex. O (Ferzacca Weekly Summary Report of Nov. 7, 1981).

In November, 1981, Mark D. Friefeld and Barry Friefeld went to National Twist's headquarters in Rochester, Michigan to effect an "arrangement", *see* Lear Siegler Br. at 2, or a "contract", *see* Marco brief at 4, by which Lear Siegler would sell cutting tools to MIS who would, in turn, resell to other distributors. At the meeting, Lear Siegler issued MIS a "quotation number", *see* Lear Siegler Br. at 2, or a "purchase order", *see* Marco Br. at 5, pursuant to which products were delivered to MIS in December, 1981. The exact terms of the "arrangements" or "contract" between MIS and Lear Siegler are, as we shall see, in dispute. Apparently, there was no written contract.

In January, 1982, MIS sent a "Trans-O-Gram", drafted by Friefeld, to all distributors on its mailing list. The message stated that "National Twist Drill Brand" was

"Now a Stocked Line at M.I.S." and quoted the following prices: (1) under $200 list: discount less 50 percent; (2) $200 list and over: discount 50 percent and 10 percent. National Twist's Distributor Discount Schedules, dated effective September 4, 1981, June 21, 1982, May 9, 1983, and March 12, 1984, announce that distributor discounts on certain listed items were: (1) orders for $500 or more at list price, minus 50 percent; (2) orders for less than $500 at list price minus 45 percent. Thus, even assuming that the percentage discounts remained the same as between MIS' and National Twist's price schedules, those discounts were available to MIS customers for much smaller orders: $200 as opposed to $500.

A copy of the Trans-O-Gram was sent to Kremser at National Twist. Other distributors, including Chicago Hi-Speed and Serson Supply also received the Trans-O-Gram. Chicago Hi-Speed and Serson Supply contacted Lear Siegler. They inquired, Def.Br. at 3, or complained, Pl.Br. at 6, about the pricing schedule of National products. Other companies contacted Lear Siegler as well and complained. Lazich Dep. at 154 (July 25, 1983). It appears, however, that the "complaints" of Chicago Hi-Speed and Serson Supply were the most vigorous.

At his deposition, Kremser testified that after one of the calls he did not "know how he pacified him. He was very angry....[,] was going to discontinue doing business with us or diminish our sales." He told the caller "[n]ot to do anything drastic and just hold his fire for awhile until I have a chance to talk and find out why they are going out to National distributor organizations." Kremser Dep. at 153 (July 26, 1983). Rosen, of Chicago Hi-Speed called Pedigree and said "[i]f National is going to continue to sell Field Tool, then I won't be able to continue to represent Standard tool." Pedigree Dep. at 94 (Oct. 19, 1983). Kremser was sure that the "problem" "wouldn't go away" and that Lear Siegler

sake of clarity we will indicate the date of the deposition as we refer to it.

was "in jeopardy with some of our good distributors." Kremser Dep. at 165. *See also* Rosen Confidential Dep. at 107 (Nov. 9, 1984); Serson Confidential Dep. at 26 (Oct. 22, 1984).

Defendants state that Kremser advised representatives of Serson Supply and Chicago Hi-Speed that Lear Siegler "would look into the "situation" and "was dealing with that matter." Def.Motion (Appendix) at 4, Fact ## 10, 11.

Kremser and Pedigree met with MIS in Chicago to try to convince it to carry the Max-Line brand. During the same trip, after meeting with MIS, they met with Bosler Supply, Serson and Chicago Hi-Speed. Pedigree Dep. at 106–107 (Oct. 19, 1983). When asked, "Are you still dealing with Field Tool?", Kremser allegedly responded, "We are still trying to resolve the issue." *Id.* at 108–109. The decision to terminate MIS as a National brand distributor was made at the meeting at which Mark Friefeld, Barry Friefeld, Pedigree, Kremser and another unnamed person were present. *Id.* at 100. Lazich made the decision to terminate MIS as a National distributor. *Id.* at 102. But Lear Siegler offered to have MIS act as a distributor of its Max-Line tools. Def.Br. at 6; Pl.Br. at 7.

Both Kremser and Lazich testified that absent the complaints of other distributors, including Serson Supply and Chicago Hi-Speed, and other problems in the future, Lear Siegler would not have terminated MIS. Kremser Dep. at 170; Lazich Dep. at 166.

Prior to 1979, MIS and Field Tool were separate corporations. MIS sold only to other distributors, while Field Tool sold both to distributors and consuming accounts (end users). Both corporations were owned by Sidney Friefeld and Edward Friefeld. In 1979, acting on advice of their accountant, Samuel A. Robbins, the corporations were merged, allegedly for tax purposes. The Articles of Merger were filed with the Secretary of State. Lear Siegler Mem., Letter from F.R. Buoscio to Samuel A. Robbins (Feb. 26, 1979). At this time,

MIS was dissolved and reincorporated to preserve its name. *Id.* In 1983, Mark D. Friefeld, the owner and president of Marco Holding, purchased all the assets of Field Tool and MIS. In 1981, he was president of MIS.

On July 15, 1982, MIS filed a complaint against Lear Siegler alleging breach of contract—promissory estoppel (count I), breach of contract—part performance (count II), and fraud and misrepresentation (count III). On May 2, 1984, MIS filed a second amended complaint, adding defendants Chicago Hi-Speed and Serson Supply and an antitrust claim (count III). On April 12, 1984, Serson filed a counterclaim and cross claim against MIS and Lear Siegler which it voluntarily dismissed on July 31, 1984. On September 13, 1984, Marco Holding, the successor corporation to Field Tool and MIS, filed a third amended complaint alleging breach of contract—promissory estoppel (count I), breach of contract—part performance (count II), antitrust violation—group boycott (count III), and tortious interference with the reasonable expectation of economic advantage (count IV). Counts I and II are directed solely against Lear Siegler. Count IV is directed solely against Chicago Hi-Speed and Serson Supply. Count III is brought against Lear Siegler, Chicago Hi-Speed and Serson Supply.

## I. *Defendants' Motion for Summary Judgment on the Antitrust Claim*

In considering a summary judgment motion, we note that a party moving for summary judgment has the burden of clearly establishing the non-existence of any genuine issue of fact material to a judgment in its favor. *Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1*, 603 F.2d 7, 10 (7th Cir.1979). Any doubts concerning material facts must be resolved against the moving party. *Moutoux v. Gulling Auto Electric, Inc.*, 295 F.2d 573, 576 (7th Cir.1961). On the other hand, any inferences to be drawn from the underlying facts must be viewed in favor of the non-moving party. *Korf v.*

*Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984).

In the particular context of antitrust actions the applicable tests for the propriety of granting summary judgment are the same, subject to the following analyses. It is certainly as true in an antitrust case as in any other that "[i]f after completion of pretrial discovery, it is clear that the plaintiff will not be able to establish at trial an essential element of his claim, the defendant is entitled to have the complaint dismissed on summary judgment; a trial would be a waste of time." *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Companies*, 682 F.2d 660, 663 (7th Cir.1982). A plaintiff must present enough evidence of conspiracy to resist defendant's motion for summary judgment. *Id.* at 662.

However, in many antitrust actions—"where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot"—summary disposition is inappropriate. *American Dermatologists' Medical Group, Inc. v. Collagen Corporation*, 595 F.Supp. 79, 81 (N.D.Ill. 1984), citing *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (footnote omitted). *Poller* stands for the proposition that, "if a claim under the antitrust laws has been adequately set forth in the complaint, the highly factual and subjective questions of intent and purpose should be resolved after discovery and trial." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984) (citation omitted) (affirming the district court's grant of defendants' 12(b)(6) motion). And in order to deny a motion for summary judgment, a court need not affirmatively find that a conspiracy exists, but only that there are factual issues concerning such a conspiracy. *American Dermatologists', supra,* 595 F.Supp. at 81. This is precisely the situation here.

Lear Siegler contends that its termination of MIS as a distributor was an independent, unilateral act, that the termina-

tion had no adverse effect on competition, and that there is no evidence of a price-fixing conspiracy so as to warrant the application of a *per se* analysis. We need not, however, and do not reach the question whether a *per se* or rule of reason analysis should be employed here, although Marco claims that even under a rule of reason analysis, the evidence sets forth a violation of the Sherman Act.

Defendants further argue that Lear Siegler's "independent decision" to terminate MIS was based on the fact that MIS had agreed to submit its mailing list for review by Lear Siegler to allow it to "purge" from the list the names of existing Lear Siegler distributors. Not surprisingly, MIS claims that no such "purge" request was ever agreed upon. There is, of course, greatly conflicting deposition testimony on the purge issue. *Cf.* (for Lear Siegler) Lazich Dep. at 127, 128; Kremser Dep. at 96–97, 142, 230; Pedigree Dep. at 66 *with* (for MIS/Marco) Mark Douglas Friefeld Dep. at 57, 73, 77, 83. Given the various views of the arrangements between MIS and Lear Siegler and drawing inferences favorably to the non-moving party, Marco, summary judgment is clearly inappropriate to resolve these disputed issues of material fact. Lear Siegler's explanation (or motive) for terminating MIS does not necessarily obviate MIS' contention that Lear Siegler agreed, with some of its distributors, to terminate MIS, to exclude it from the market, thereby protecting and stabilizing resale prices to both the end user market, as well as the distributor market.

Defendants argue that the Supreme Court's recent decision in *Monsanto Company v. Spray-Rite Service Corporation*, — U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) mandates the grant of summary judgment on Marco's antitrust claim. In *Monsanto*, the Court considered the standard of proof required to find a vertical price-fixing conspiracy in violation of Section 1 of the Sherman Act. We note, though, that the court's analysis was directed to that standard of proof which a plaintiff must satisfy in order to prevail

*ultimately,* not to defeat a motion for summary judgment. *See American Dermatologists', supra,* 595 F.Supp. at 82 n. 2.

In *Monsanto,* the Court reiterated the two important distinctions at the center of any distributor-termination case. First, Section 1 does not proscribe "independent" action. A manufacturer can refuse to deal with whomever it likes, as long as it does so independently. Second, the Court distinguished between concerted action to set prices and concerted action on nonprice restrictions; the former are subject to a *per se* standard, while the latter are judged under the rule of reason. *Monsanto, supra,* 104 S.Ct. at 1469. The Court cautioned against permitting the inference of an agreement "merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints...." Something more than evidence of complaints is needed, such as evidence that "tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* at 1470–71. "[T]here must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious committment to a common scheme designed to achieve an unlawful objective." *Id.* at 1473.

In the context of Lear Siegler's motion for summary judgment, we believe that plaintiff has produced enough evidence so that a trier of fact might reasonably decide that it meets the *Monsanto* standard.[2] *See American Dermatologists', supra,* 595

F.Supp. at 82. Given the timing and practically undisputed vehemence of Serson Supply's and Chicago Hi-Speed's complaints, the attendant threats to reduce or eliminate business with Lear Siegler, the timing of the termination, and the different discount price schedules offered by MIS and Lear Siegler, Marco is entitled to present its antitrust claim to the jury.

■ This is not to suggest that plaintiff will ultimately prevail on count III. To do so, Marco must present sufficient evidence for a jury to reasonably conclude that Lear Siegler and some of its distributors, Chicago Hi-Speed and Serson Supply, were parties to an agreement or conspiracy to maintain resale prices and to terminate price cutters, such as MIS, and where the termination was part of the agreement. *Monsanto, supra,* 104 S.Ct. at 1471. We conclude only that there remain genuine issues of material fact with respect to a conspiracy under the Sherman Act so as to warrant the denial of defendants' summary judgment motion.

### Sanctions

Plaintiff claims that the "frivolity" of defendants' summary judgment motion requires that sanctions be awarded. It claims that not only have defendants filed a motion which has no basis in law, but also one in which fact statements claimed to be "undisputed" seriously conflict with deposition testimony. *See* Pl.Ex.B (Analysis of

---

**2.** Defendants' reliance on *Computer Place, Inc. v. Hewlett-Packard Co.,* 1984–2 Trade Cases ¶ 66,254 (N.D.Cal.1984) and *Gillette Tire Jobbers of Louisiana, Inc. v. Appliance Industries, Inc.,* 596 F.Supp. 1277 (E.D.La.1984) is unavailing. Those cases do not persuade us that summary judgment is appropriate here. In fact, the court's discussion in *Computer Place* of the relative burdens to be carried on a summary judgment motion lends weight to our conclusion. The court stated:

> Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper.

*Id.* at 67,100. *Cf. Moore v. Boating Industry Ass'ns,* 754 F.2d 698, 710 (7th Cir.1985) (refusing to overturn a jury verdict where there is "sufficient evidence in the record to demonstrate that the members [of the association] acted in response to the threat by the defendants to revoke the members' certificate of approval if they used [plaintiffs'] Model 701....")

In this case, plaintiff has proffered specific factual support of its allegations of conspiracy through the deposition testimony of officers and employees of defendants and exhibits of price discount schedules. And in *Gillette,* the court relied on the language in *Monsanto* which we have previously stated does not support a grant of summary judgment under the facts of this case.

Defendants' "Undisputed" Facts). Additionally, at a status hearing on November 29, 1984, when Lear Siegler's counsel indicated it would be filing a summary judgment motion on the antitrust count, we, in no uncertain terms, informed defendants' counsel that if the motion was "spurious", we would assess costs and sanctions. By "spurious", we meant that if defendants relied on deposition testimony of the alleged co-conspirators denying an illegal conspiracy and that testimony did not, indeed, "prove anything". Tr. at 11–14 (Nov. 29, 1984).

Defendants' motion has resulted in the submission of hundreds of pages of deposition testimony, as well as the briefs. The clear impression with which we are left after carefully examining all of the various documents is that a fair reading of the deposition testimony of Lear Siegler's own officers and employees, Kremser, Lazich, and Pedigree, and Serson and Rosen of Serson Supply and Chicago Hi-Speed, tends, if anything, to undermine rather than to support defendants' contention that there are no material issues of fact relating to a conspiracy. And, in several instances, defendants artfully mischaracterize this testimony, as plaintiff calls to our attention in its Exhibit B.

Nevertheless, although defendants were warned about putting the Court and the other side through unnecessary exercises, Tr. at 14, we are somewhat hesitant about imposing costs and sanction either under Fed.R.Civ.P. 11 or 28 U.S.C. § 1927 as a result of their bringing this motion.

Fed.R.Civ.P. 11 in relevant part provides:

**Rule 11. Signing of Pleadings, Motions and Papers, Sanctions**

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reason-able inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

(As amended Apr. 28, 1983, eff. Aug. 1, 1983).

The standard to be applied under the new version of Rule 11 is one of reasonableness; it is more strigent than the original good faith formula and it is expected that a wider range of circumstances will trigger its violation. *SFM Corporation v. Sunstrand Corporation*, 102 F.R.D. 555, 556 (N.D.Ill.1984). Rule 11 sanctions are not, however, intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories and a court should avoid using the wisdom of hindsight in examining the attorney's conduct at the time of the pleading. Fed.R.Civ.P. 11, Notes of Advisory Committee.

We must conclude that, though this is an extremely close case and our initial inclination is to assess costs and sanctions, defendants' legal theories are not so unreasonable nor the deposition testimony so devoid of their interpretation as to justify sanctions under Rule 11.

We reach a similar conclusion with respect to an award of fees against defendants' counsel based on 28 U.S.C. § 1927. That section provides:

**§ 1927. Counsel's liability for excessive costs**

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

(As amended Sept. 12, 1980, Pub.L. 96–349, § 3, 94 Stat. 1156.)

▆▆▆ Section 1927 might support an award of fees against defendants' counsel. *See Suslick v. Rothschild Securities Corp.,* 741 F.2d 1000, 1006 (7th Cir.1984). The Seventh Circuit holds that there are two prerequisites for the imposition of fees under section 1927; (1) the actions by the attorney must multiply the proceedings; and (2) these actions must be vexatious and unreasonable. The second prong requires subjective bad faith by the attorney. While the lack of merit of an action is evidence of bad faith, "the claim must lack even a colorable basis in the law to justify an award of fees." *Id.* (citations omitted).

▆▆▆ Section 1927, because of its penal nature, has been strictly construed. The power to assess costs on opposing counsel arises in response to a " 'serious and studied disregard for the orderly process of justice.' " *Badillo v. Central Steel & Wire Co.,* 717 F.2d 1160, 1166 (7th Cir. 1983) (citations omitted). Although it is clear that the summary judgment motion is without merit, we are unable to find the requisite degree of culpability on the part of defendants' counsel or a complete lack of plausible basis for the motion or a showing of intentional misconduct. *Knorr Harbill Brake Corp. v. Harbil, Inc.,* 738 F.2d 223, 227 (7th Cir.1984). We, therefore, conclude that the facts and circumstances of this case do not merit the extreme sanction of awarding fees and costs against defendants' counsel.

II. *Plaintiff's Motion to Strike or in the Alternative for Summary Judgment and Sanctions*

On September 24, 1984, some ten days after plaintiff filed its third amended complaint, Lear Siegler filed a counter-claim against Marco Holding, Field Tool, MIS, and Mark D. Friefeld, alleging that Friefeld misrepresented the "true situation" of the relationship between MIS and Field Tool (count II of the counterclaim). Lear Siegler contends that Friefeld's statements were made in order to influence Lear Siegler to sell tools to MIS and that the statements were material to the Lear Siegler decision to do business with MIS. It claims that it did not want to enter into a comparable arrangement with Field Tool because, among other reasons, Field Tool sold directly to consumers. Lear Siegler alleges that it unintentionally and unknowingly dealt with Field Tool and was damaged as a result of the "fraudulent and deceitful misrepresentation."

Lear Siegler's first affirmative defense states that plaintiff's claims are barred because of the "fraudulent and inequitable conduct of MIS and Field Tool." Lear Siegler's second affirmative defense alleges that MIS, a claimant in the various counts of the third amended complaint, was not the real party in interest for the matters alleged because it existed in all relevant respects only as a division of Field Tool.

Plaintiff moves under Fed.R.Civ.P. 12(f) for an order striking count II of Lear Siegler's counterclaim and first and second affirmative defenses or, alternatively, for summary judgment under Fed.R.Civ.P. 56, and for sanctions under Fed.R.Civ.P. 11. Initially, we must determine the proper procedural approach to the resolution of the issues raised by plaintiff's motion.

▆▆▆ Plaintiff's Rule 12(f) motion to strike defendant's first and second affirmative defenses alleges that they are insufficient and immaterial. Rule 12(f) permits the court, on its own initiative or upon motion by a party, to order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Ordinarily, a Rule 12(f) motion is decided on the basis of the pleadings alone. Here, however, both plaintiff

and defendant have submitted exhibits and deposition testimony in support of their positions.

Unlike a Rule 12(b)(6) motion, there is no comparable provision for "converting" a 12(f) motion to strike an insufficient defense into a Rule 56 motion for summary judgment. However, several commentators suggest that, if matters outside the pleadings are presented and considered, especially those testing the legal sufficiency of a defense, a Rule 12(f) motion can be transformed into a motion testing the factual and evidentiary, as well as the legal, basis for the challenged pleading and would serve much the same function as a motion for summary judgment. *See* C. Wright & A. Miller, 5 Federal Practice & Procedure, § 1380 at 789 (1969).

Although some courts conclude that matters outside the pleadings should never be considered when ruling on a motion to strike, *see, e.g., Krauss v. Keibler-Thompson Corp.*, 72 F.R.D. 615, 617 (D.Del.1976), other courts have done so in the course of "converting" a 12(f) motion into one for partial summary judgment. *See, e.g., Morrill v. Becton, Dickenson and Company*, 216 U.S.P.Q. 550, 552 (E.D. Mo.1981) and cases cited therein; *General Dynamics Corp. v. United States*, 558 F.2d 985, 989, 214 Ct.Cl. 607 (1977). We believe that this is the better approach, especially here where the challenge is directed at the substance, rather than at the form of defendant's pleading. *See The Motion to Strike an Insufficient Defense— Rule 12(f) of the Federal Rules of Civil Procedure*, 11 Rutgers-Camden L.J. 441, 443, 457 (1980). *See also* Wright & Miller, *supra* (the conversion provisions in 12(b)(6) and 12(c) were inserted at the same time as the motion to strike an insufficient defense was formally recognized and the possibility of extending the practice to 12(f) may have been overlooked); Report of the Advisory Committee on Federal Rules of Civil Procedure Recommending Amendments, 5 F.R.D. 339, 345 (1946) (the failure to draft a conversion clause similar to that in 12(b)(6) and 12(c) was unintentional). We will, therefore, treat plaintiff's 12(f) motion as one for partial summary judgment, as it alternatively requests, and will apply the same standard for summary judgment as delineated earlier in this opinion.

Lear Siegler contends that there are genuine issues of material fact relating to "the fundamental point that had Lear Siegler been informed that it was inadvertently dealing with Field Tool instead of MIS, it would not have entered into the transactions resulting in this litigation." In support of its contention, Lear Siegler offers the recent affidavits of Lazich (Nov. 27, 1984), Kremser (Nov. 27, 1984), and Ferzacca (Nov. 28, 1984). Plaintiff argues that by these affidavits Lear Siegler is attempting to create issues of fact, that in certain instances the statements made in the affidavits do not gibe with those made in deposition testimony taken more than a year prior to the affidavit, and that this discrepancy between affidavit statements and deposition testimony is, in any event, insufficient to defeat its summary judgment motion because it is not *material*. We agree.

Indicative of Lear Siegler's unpersuasive attempt is Lazich's deposition testimony of December 6, 1984, taken after his November 27, 1984 affidavit, which plaintiff characterizes as a classic "where's the beef?" or "distinction without a difference" situation. When questioned with respect to the intricacies of the relationship between MIS and Field Tool, the following exchange took place:

Q I refer you to paragraph 9 of your affidavit which states that in November, 1981, National Twist did not want to sell cutting tools under the arangements entered into with M.I.S. for a business that was controlled by Field Tool. What do you mean by "controlled by Field Tool"?

A Controlled or owned, I guess it would be.

Q What is the difference between Field Tool owning M.I.S. or the owners of Field owning M.I.S.?

A Again, I would go back to the separate operation in the preceding paragraph.

Q I am not asking about operations now. I am asking you about what is the difference between being controlled by Field Tool or that the owners of Field Tool owned M.I.S.?

A Being controlled means that they are not operating separately.

Q So what? What is the difference? What is the difference between being controlled by Field Tool and between Field Tool owning M.I.S.? Or what is the difference between M.I.S. being controlled by Field Tool and the owners of Field Tool owning M.I.S.?

A There was no M.I.S.

Q Well, you say that they were controlled by Field Tool. I am asking what is the difference....

A We didn't want to do business with Field Tool.

Q But you know they had the same owners?

A Common owners but separate corporations is the way it was described to us.

Lazich Dep. at 238–239 (Dec. 6, 1984). The colloquoy continues for several more pages.

There is substantial deposition testimony to the effect that in 1981 Lear Siegler knew that MIS was part of Field Tool and did not then regard that as material, being concerned mainly that MIS, in contrast to Field Tool, would sell to other distributors and not to end users. *See, e.g.*, Pl.Ex.5, Ferzacca Dep. at 18 (Mar. 23, 1983); Pl.Ex.10, Kremser Dep. at 175 (July 26, 1983) (apparently, in early 1982, a meeting took place at *Field Tool* in which "Bob" (Robert Pedigree, most likely) and Kremser tried to sell to MIS the Max-Line products after telling Friefeld that Lear Siegler would not accept orders for National Products); *id.* at 99 ("I wasn't aware of the connection with Field Tool ... they [Friefelds] explained that that was part of their or there was interlocking ownership or whatever, they were affiliated in some way or another.... it came out that Field Tool and MIS were intertwined in some way or another.") When questioned whether he had any concerns about that, Kremser replied: "Concerned if they may sell to Field Tool? It was not a major concern. It was something I was interested in." *Id. See also id.* at 171 (when Kremser and Lazich arrived at MIS in Chicago they were told to go to Field Tool); Pl.Ex.11, Lazich Dep. at 126 (July 25, 1983) (at the Rochester, Michigan meeting attended by Lazich, Kremser, Barry Friefeld and Mark Friefeld, MIS' relationship with Field was discussed); Pl. Ex.15, Kremser Dep. at 209 (Dec. 6, 1984) (When asked whether he knew in November, 1981, that MIS was going to sell National products to Field Tool, Kremser replied that he was not sure but he "assumed that there would be some product sold to FTS" and that he had had a discussion with MIS about their relationship with Field Tool and about their selling products to Field Tool); Pl.Ex.16, Lazich Dep. at 252–3 (Dec. 6, 1984) (Lazich was aware that MIS would be selling National products to Field Tool); Pl.Ex.12, Blanket Quotation (Nov. 20, 1981) and attached document signed "approved" by Kremser on review dated May 19, 1982, naming "F.T.S." as consumer.

▮ We have considered carefully Lear Siegler's fact statements and citations to the record therein.[3] We are unable to conclude that the MIS/Field Tool relationship was, in any way material to the events occurring in 1981 and 1982, which are the subject matter of this lawsuit. Further,

---

**3.** We have also considered and rejected Lear Siegler's argument that MIS is not the real party in interest here and lacks the corporate standing to pursue the action. *See* Fed.R.Civ.P. 17(a), (b). In December, 1983, Marco purchased the assets of MIS and Field Tool and in September, 1984, plaintiff was granted leave to amend its complaint and substitute Marco as plaintiff. *See* Pl.Motion for Leave to File Instanter, ¶ 1 (Sept. 13, 1984). Further, Lear Siegler's reliance on *Moore v. Matthew's Book Co.,* 597 F.2d 645 (8th Cir.1979) is misplaced. There, the corporation had forfeited its corporate existence by failing to file its annual registration and antitrust reports with the State of Missouri. In that instance, only all of the statutory trustees, not the corporation, could bring suit. Here, however, MIS was a registered corporation at all relevant times, regardless whether, as Lear Siegler claims, it existed in "name" only.

we question whether affidavits, submitted only after plaintiff's summary judgment motion, which attempt to recharacterize circumstances extensively covered in prior deposition testimony more than one year earlier, can aid Lear Siegler in its attempt to show genuine issues of material fact requiring a trial.

At least two courts have commented on this practice. In *Radobenko v. Automated Equipment Co.*, 520 F.2d 540, 543–44 (9th Cir.1975), the court noted that on a summary judgment motion a court does not try issues of fact, but rather it examines the entire record and first decides the limited question whether any factual issues exist. In that case, the Ninth Circuit pointed out that if there existed any issue of fact, it existed only because of the inconsistent statements made by a person as a deponent and a person as an affiant. The court rejected appellant's efforts to characterize issues of fact as "genuine issues" of fact and affirmed the District Court's grant of summary judgment. *Id.* at 544, citing *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969).

In *Perma Research,* the Second Circuit similarly considered the situation where inconsistent statement are made by one as a deponent and by the same one as an affiant. Noting that deposition testimony is usually more reliable than an affidavit statement since the deponent is at least available for cross examination, the court nevertheless concluded that a court may not exclude the affidavit from consideration to determine whether there is any genuine issue as to any material fact. The court affirmed the grant of summary judgment and voiced concerns about the same type of situation as exists here. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. . . . a party who resists summary judgment cannot hold back his evidence until the time of trial." *Id.* at 578 (citations omitted). *See also Barwick v.*

*Celotex Corp.,* 736 F.2d 946, 960 (4th Cir. 1984); *Chrysler Credit Corp. v. Burton,* 599 F.Supp. 1313 (M.D.N.C.1984).

That is precisely what Lear Siegler has attempted to do here. Our reaction is the same. Plaintiff's motion for summary judgment on Lear Siegler's counterclaim is granted.

## Sanctions

Plaintiff also requests that we assess fees and costs under Fed.R.Civ.P. 11 against Lear Siegler. It claims that since the July 12, 1984, deposition of Samuel Robbins, where Lear Siegler allegedly first learned of the Merger of MIS and Field Tool, Lear Siegler has wasted judicial time and has pursued oppressive discovery to substantiate its "fraud" defense.

Earlier in this opinion we discussed the applicability of Rule 11 sanctions, which we denied, with respect to defendants' summary judgment motion. We are inclined to adopt the same approach for purposes of plaintiff's motion here. Even with the easing of the Rule 11 standard by changing the discretionary language to the directive that a court "shall impose", it does not follow that Rule 11 sanctions should be imposed in every instance a motion is denied, a pleading struck, or summary judgment granted. We note, for instance, that even though the Seventh Circuit quoted the "new" language of Rule 11 in a recent case, the court seemed to be applying the "old" "subjective bad faith" requirement, stressing the "colorable nature" of the claim. *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000, 1003 n. 3, 1006 (7th Cir.1984).

Wherever the line of demarcation may ultimately be drawn as to Rule 11 sanctions, we surmise that Lear Siegler is treading very close to it. We are, however, unable to conclude that its litigation strategy has clearly transgressed that line. We, therefore, deny Marco's request for sanctions against Lear Siegler for bringing

count II of its counterclaim and first and second affirmative defenses.

### Conclusion

Defendants' summary judgment motion is denied. Plaintiff's request for sanctions in conjunction with that motion is denied. Plaintiff's motion for summary judgment on count II of Lear Siegler's counterclaim and first and second affirmative defenses is granted. Plaintiff's request for fees and costs necessitated by Lear Siegler's pleadings is denied. An appropriate order will enter.