KELLY LYNN LEWIS, Petitioner, *v.* THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, in and for the County of Washoe, and THE HONORABLE CHARLES M. McGEE, District Judge, Respondents, and MARK QUINTIN LEWIS, Real Party in Interest.

No. 27119

January 4, 1997 930 P.2d 770

*Martin Crowley,* Reno, for Petitioner.

*David D. Loreman,* Elko, for Real Party in Interest.

## OPINION

By the Court, YOUNG, J.:

### FACTS

On April 6, 1988, petitioner Kelly Lynn Lewis ("Kelly") and respondent Mark Quintin Lewis ("Mark") were granted a decree of divorce, subsequently modified on August 8, 1988, by respondent Second Judicial District Court ("district court"). During the course of their eight-year marriage, Kelly and Mark produced three children, Jessica (DOB 2-21-82), Eric (DOB 7-14-84) and Kyle (DOB 8-11-85), who are the subject matter of these proceedings.

The April 6, 1988 divorce decree granted Kelly physical custody of the children, while the August 8, 1988 modification allowed Mark two months visitation during the summer and two weeks visitation during both Christmas and Easter. In October 1993, Mark filed a motion to modify custody in the district court.

On June 2, 1995, after appointing a licensed clinical social worker, Frank Hall ("Hall"), to thoroughly inquire into Kelly's accusations of physical and sexual abuse by Mark toward his children, the district court orally ordered the enforcement of the April 6, 1988 divorce decree and the August 8, 1988 modification.

On June 13, 1995, before the district court filed its written order and findings regarding the June 2, 1995 hearing, Kelly filed an emergency petition for a writ of mandamus and prohibition with this court. The petition for a writ of mandamus urges this court to direct the district court to conduct a hearing or hearings regarding the visitation issues surrounding the children. The petition for a writ of prohibition endeavors to prevent the district court from enforcing its orally announced order of June 2, 1995.

On June 13, 1995, the same day Kelly filed her emergency petition, this court entered an order staying (1) any further proceedings in the district court; and (2) the district court's orally pronounced order of June 2, 1995.

On June 19, 1995, the district court filed a written order enforcing the April 6, 1988 divorce decree and the August 8, 1988 modification, including Mark's visitation rights with his children. The June 19, 1995 written order further stated that the district court had no current intention of changing child custody and that Kelly would be responsible for half the children's transportation costs to Mark's residence in Elko, Nevada. Additionally, despite our dissenting colleague's unfounded assumptions,

the June 19, 1995 order clearly mandated that Kelly and Mark comply with a reintroduction plan which was carefully crafted by the court-appointed social worker, Hall.[1]

## DISCUSSION

### Jurisdiction of the district court

During the proceedings below and in her petition for an extraordinary writ, Kelly argued that the district court lacked subject matter jurisdiction over the proceedings. We have previously indicated that a determination of subject matter jurisdiction by the district court is a threshold requirement of the Uniform Child Custody Jurisdiction Act ("UCCJA"). Swan v. Swan, 106 Nev. 464, 469, 796 P.2d 221, 224 (1990). The *Swan* court further suggested that "subject matter jurisdiction can be raised by the parties at any time, or sua sponte by a court of review, and cannot be conferred by the parties." *Id.*

Contrary to Kelly's contention regarding the district court's purported lack of subject matter jurisdiction, we conclude that the district court had jurisdiction over the motion to modify child custody in the case at bar.

In 1979, the Nevada Legislature adopted the UCCJA. NRS 125A.010. The UCCJA was "designed to bring some semblance of order into the existing chaos" of child custody jurisprudence.

---

[1]Hall proposed the following plan to reintroduce the children to their father:

> 1.) Initial contact should begin by the children's father sending them letters, presents, etc., and talking to them on the telephone.
> 2.) In-person visitation must occur in an arena in which the children feel safe. It would be the recommendation of this therapist that Dr. Laskow and the Offices of the Desert Community Mental Health Center be the supervising agent for reintroducing father and the children.
> 3.) Activity-centered contact between father and children, in California, can begin when Dr. Laskow believes that the children are ready to take this step.
> 4.) At the time Dr. Laskow believes that the children's comfort level is sufficient to allow visitation with their father and step-mother in Elko, such visitation should be supervised by an experienced mental health professional.
> 5.) Upon demonstration of successful reintroduction of children and father and step-mother, the parties need to make use of a formal mediation process to work out an on-going custody and visitation plan. In view of the many moves and uprootings these children have already undergone, it would be this therapist's strong recommendation that the children continue to attend their current school where they are comfortable and have achieved some real success, both academically and socially.

Prefatory Note to Unif. Child Custody Jurisdiction Act, 9 U.L.A. 118 (1979); *see also* NRS 125A.020 (indicating statutory purposes of Nevada's version of the UCCJA). Also, recognizing that the person who has physical possession of the children had an enormous tactical advantage in child custody disputes, the UCCJA was meant "[t]o remedy the intolerable state of affairs where self-help and the rule of 'seize-and-run' prevail rather than the orderly processes of the law." Prefatory Note to Unif. Child Custody Jurisdiction Act, 9 U.L.A. at 117.

Jurisdiction over child custody disputes in Nevada is governed by NRS 125A.050. In pertinent part, NRS 125A.050 provides that a court of this state has jurisdiction to make a child custody determination by initial or modifying decree if:

> (b) It is in the best interests of the child that a court of this state assume jurisdiction because:
>
> (1) The child and his parents, or the child and at least one contestant, have a significant connection with this state; and
>
> (2) There is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships.

In *Swan,* we held that the Nevada district court did not have jurisdiction under NRS 125A.050(1)(b) to enter a divorce decree which granted the father custody of his children. *Swan,* 106 Nev. at 467, 796 P.2d at 223. However, the facts of the *Swan* case are dissimilar to the facts of the present case. In *Swan,* the father moved to Nevada in January 1987. *Id.* at 466, 796 P.2d at 222. Several months later, he removed the children from their home state of Utah and brought them to Nevada. *Id.* Less than forty days after he brought the children to Nevada, he filed a complaint for divorce and sought custody of the children. *Id.* The district court entered a divorce decree and granted custody of the children to the father. *Id.* The children's mother filed a motion to vacate the child custody award because the district court lacked subject matter jurisdiction. *Id.*

After the mother's motion to vacate the custody decree was denied by the district court, she appealed to this court, arguing that the district court erred when it refused to grant her motion to vacate. *Id.* We agreed, stating that "[r]esiding in Nevada for less than forty days can hardly constitute a significant connection."[2]

---

[2]Another fact which distinguishes *Swan* from the case at bar is that the Nevada district court, at the time it granted the divorce decree and granted the father custody of the children, knew that there was an action pending in the Utah district court on the same subject matter. *See Swan,* 106 Nev. at 467, 796 P.2d at 223. In spite of this apparent jurisdictional conflict, the Nevada district court proceeded with the father's complaint for divorce. In

*Id.* at 467, 796 P.2d at 223. Accordingly, we ruled that the district court was not authorized to exercise its jurisdiction under the significant-connection provision of NRS 125A.050(1)(b). *Id.*

In the present case, the district court's determination regarding jurisdiction is consistent with factually analogous decisions from other states which have interpreted the UCCJA. *See* In re Marriage of McEvoy, 414 N.W.2d 855 (Iowa Ct. App. 1987); Joseph E. H. v. Jane E. H., 423 A.2d 739 (Pa. Super. Ct. 1980) (remanded on other grounds). In *McEvoy,* the court stated that "[s]ignificant connection jurisdiction will continue in the decretal state where the court record and other evidence exists and where one parent continues to reside." *McEvoy,* 414 N.W.2d at 857. In *Joseph E. H.,* the court held that significant-connection jurisdiction had been established in Pennsylvania, notwithstanding the fact that the mother and child were residents of Maryland. *Joseph E. H.,* 423 A.2d at 741. The *Joseph E. H.* court's determination of significant connections with Pennsylvania was based upon the following: (1) the length of the parents' and son's previous residence in Pennsylvania; (2) the father's continued residence in Pennsylvania; (3) the son was born in Pennsylvania and lived there until the mother moved with him to Maryland; (4) the parents had previously litigated the question of child custody in Pennsylvania; and (5) the parents were subject to an order of the Pennsylvania court concerning custody and visitation. *Id.*[3]

contrast, and what we must emphasize, to this court's knowledge, there are *no proceedings pending* in the children's home state of California.

Additionally, unlike in *Swan,* a divorce decree and modification, including custody and visitation orders, were *already in place* prior to Kelly and the children leaving Nevada. Although Mark motioned for a change of custody, the district court declined to do so and merely enforced the *already existing* visitation order, while ordering compliance with a reunification plan to effectuate that visitation. Therefore, in effect, the district court left the parties virtually as they were at the time of the divorce decree and modification.

[3]Our dissenting colleague cites only to Sholty v. Carruth, 616 P.2d 918 (Ariz. Ct. App. 1980), for his proposition that this court should deny jurisdiction over this matter pursuant to the UCCJA. In *Sholty,* the Arizona Court of Appeals held that an Ohio trial court had no jurisdiction to grant the father visitation with his children who previously moved with their mother from Ohio to Arizona. *Id.* at 919. One significant difference from the present case is that in *Sholty* the father was first seeking visitation; whereas, here, the district court merely enforced visitation rights that had already been established while Nevada was still the Lewis children's home state.

Additionally, in *Sholty,* the mother challenged the Ohio order in Arizona by way of a petition for a temporary restraining order, alleging that Arizona had the proper jurisdiction, not Ohio. *Id.* at 918. Conversely, to this court's knowledge, at no time had Kelly brought any legal action in California with respect to this case and even chose to challenge the district court's order in

Similarly, in the present case, we conclude that the requirements for jurisdiction set forth in NRS 125A.050(1)(b) have been met for the following reasons: (1) Kelly, Mark and their children had previously resided in Nevada for several years prior to the divorce proceedings; (2) Mark has continuously resided in Nevada and plans to continue residing in this state with his current wife; (3) the children were born in Nevada and lived here for several years until Kelly moved them to several other states before eventually settling in California with her new husband; (4) Kelly and Mark have previously litigated the issue of child custody in the district court on several previous occasions and the entire court record concerning the children's custody is located in Nevada; and (5) the parents are subject to an order of the district court concerning the custody and visitation of their children.

We further conclude that "[t]here is available in this state substantial evidence concerning the child[ren]'s present or future care, protection, training and personal relationships." NRS 125A.050(1)(b)(2). It is inarguable that the district court has a keen understanding of the issues surrounding this child custody matter. The district court entered the initial divorce decree in addition to the modification of the initial divorce decree. Also, the district court heard numerous motions and contentions regarding the children's custody resulting from Mark's motion to modify the divorce decree. Consequently, because of the district court's intimate familiarity with the child custody matter at issue, we conclude that the district court is in the best position to render a child custody determination that is in the best interests of the children. Additionally, we note that Hall, the court-appointed social worker, is present in this state. Hall conducted an extensive home study and evaluation of the parties involved in this case and submitted a report to the district court which included the reintroduction plan. To reiterate, in its June 19, 1995 order, the district court mandated that this reunification plan be followed to effectuate visitation between Mark and his children. Despite our dissenting colleague's concern, we have every confidence that the district court will oversee the execution of this plan.

We do not dispute that the children have significant connections to the State of California because they have been residing in that state for the previous several years. Also, Kelly and several of her relatives reside in the State of California. Although the California courts are undoubtedly qualified to handle motions to

Nevada rather than petitioning a California court to assume jurisdiction. Consequently, we do not find Sholty persuasive and prefer to follow the authority of *McEvoy* and *Joseph E. H.*

modify child custody which were originally entered in another jurisdiction, based upon the facts of this case, we believe that the district court's continuing jurisdiction over the present child custody matter will further the UCCJA's goals.[4]

In sum, a conclusion that the district court lacked subject matter jurisdiction to entertain Mark's motion to modify child custody will contradict the letter and spirit of the UCCJA, further delay the children's reunification with their natural father and result in an unnecessary waste of scarce judicial resources. We cannot subscribe to this notion.

### Petition for writ of mandamus

A writ of mandamus is available to compel the performance of an act which the law requires as a duty resulting from an office, trust or station, NRS 34.160, or to control an arbitrary or capricious exercise of discretion. *See* Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 603-04, 637 P.2d 534, 536 (1981). We conclude that the district court did not act arbitrarily or capriciously during the course of the June 2, 1995 hearing. *See* NRS 125A.310. Accordingly, we perceive no compelling reason for granting Kelly's petition for a writ of mandamus. *See* Poulos v. District Court, 98 Nev. 453, 455, 652 P.2d 1177, 1178 (1982).

---

[4]With regard to the modification of another state's custody decree, the UCCJA authors wrote that "[c]ourts which render a custody decree normally retain continuing jurisdiction to modify the decree under local law." Unif. Child Custody Jurisdiction Act § 14 commentary, 9 U.L.A. 292 (1979). The authors further stated that

[i]n order to achieve greater stability of custody arrangements and avoid forum shopping, . . . other states will defer to the continuing jurisdiction of the court of another state as long as that state has jurisdiction under the standards of this Act. In other words, *all petitions for modification are to be addressed to the prior state if that state has sufficient contact with the case to satisfy [the UCCJA's jurisdictional requirements].* The fact that the court had previously considered the case may be one factor favoring its continuing jurisdiction.

*Id.*

Numerous prominent commentators have also expressed their opinions that the UCCJA's goals will be furthered, provided that jurisdiction has been met, if the state which entered the original child custody decree retains exclusive continuing jurisdiction over the matter. *See, e.g.,* Brigitte M. Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under UCCJA,* 14 Fam. L.Q. 203, 214 (1981) (stating that the UCCJA rule of continuing jurisdiction "carries out the Act's two objectives of (1) preventing the harm done to children by shifting them from state to state to relitigate custody, and (2) preventing jurisdictional conflict between the states after a custody decree has been rendered"); Helen Donigan, *Child Custody Jurisdiction: New Legislation Reflects Public Policy Against Parental Abduction,* 19 Gonz. L. Rev. 1, 18 (1983) (stating that "[a] uniform deference to the original state creates predictability and lessens incentives to continuously relitigate custody orders in new states").

*Petition for writ of prohibition*

A writ of prohibition may issue to arrest the proceedings of a district court exercising its judicial functions when such proceedings are in excess of the jurisdiction of the district court. NRS 34.320. We conclude that the district court's June 2, 1995 oral order was not outside the district court's authority and did not transcend the limits of its jurisdiction. Instead, we conclude that the district court's June 2, 1995 oral order was simply effectuating the April 6, 1988 divorce decree and its August 8, 1988 modification. Accordingly, we deem Kelly's petition for a writ of prohibition unwarranted. *See* Smith v. District Court, 107 Nev. 674, 677, 818 P.2d 849, 851 (1991).

In coming to this conclusion, we recognize that the district court's June 19, 1995 written order was entered after our June 13, 1995 order staying all further proceedings in the district court. Consequently, we deem the district court's June 19, 1995 written order void. However, this conclusion does not prohibit the district court from entering an identical order after this court files the present opinion.

*Request for attorney's fees pursuant to NRCP 11*

We conclude that Mark's request for attorney's fees pursuant to NRCP 11 is without merit. NRCP 11 sanctions should be issued for frivolous actions. Marshall v. District Court, 108 Nev. 459, 465, 836 P.2d 47, 52 (1992). However, NRCP 11 sanctions are "not intended to chill an attorney's enthusiasm or creativity in reasonably pursuing factual or legal theories, and a court should avoid employing the wisdom of hindsight in analyzing an attorney's action at the time of the pleading." *Id.* at 465-66, 836 P.2d at 52 (citing Marco Holding Co. v. Lear Siegler, Inc., 606 F. Supp. 204, 211 (N.D. Ill. 1985)). In the case at bar, we conclude that Kelly's petition for a writ of mandamus and prohibition was not brought frivolously. Therefore, we conclude that NRCP 11 sanctions are not appropriate.

## CONCLUSION

Having concluded that Kelly's petition for a writ of mandamus and prohibition will not be granted, we do not need to address her other contentions regarding Hall's removal from the case or reassigning the case to another department of the district court.

Accordingly, we deny Kelly's petition for a writ of prohibition and mandamus. Furthermore, our June 13, 1995 order staying (1) any further proceedings in the district court; and (2) the district

court's June 2, 1995 orally pronounced order is hereby vacated in its entirety.

SPRINGER, SHEARING, and ROSE, JJ., concur.

STEFFEN, C. J., dissenting:

I am unable to endorse the Majority Opinion for two reasons. First, the majority has apparently failed to discern that the respondent district court has not followed and, quite obviously, does not intend to follow the "carefully crafted" gradual reintroduction plan quoted approvingly in footnote 1 of the Majority Opinion. Second, in my view, the majority's decision does not properly apply and construe the Uniform Child Custody Jurisdiction Act (UCCJA). *See* NRS Chapter 125A. In particular, the Majority Opinion does not promote the general purposes of the UCCJA to assure that child custody litigation is ordinarily resolved in the state where children and their families have "the *closest* connection," and where *significant* evidence concerning the children's "care, protection, training and personal relationships is *most readily available.*" *See* NRS 125A.020(3) (emphasis added). Nor does the Majority Opinion advance the general purpose of the UCCJA to assure that the courts of this state decline jurisdiction over custody disputes when children and their families have "a *closer connection with another state.*" *Id.* Therefore, I respectfully dissent.

## THE REINTRODUCTION PLAN

On June 13, 1995, petitioner Kelly Lynn Lewis (Kelly), filed in this court an emergency petition seeking an immediate stay of proceedings before the respondent district court and this court's issuance of writs of mandamus and prohibition. Specifically, Kelly requested this court to prevent "the District Court from enforcing its orally announced order of June 2, 1995," and "to issue an emergency order staying the District Court's order pending a full and fair determination of this petition . . . ."

Because the district court had not yet entered a written order memorializing its oral ruling of June 2, 1995, Kelly attached to her petition a copy of the minutes of the in-chambers proceeding conducted by the district court. The minutes disclose that the district judge announced the following ruling at the conclusion of the June 2, 1995, in-chambers proceeding:

> COURT ORDERED: Plaintiff [Kelly] held in civil contempt of Court and is to be placed in custody of the Washoe County Sheriff until the contempt is purged. The plaintiff may purge this contempt by supplying to the Court the face sheets of either three or four one-way tickets to Elko,

Nevada for the children to have visitation with their father after school is out. *It will then be determined by Mr. Hall whether or not the children need to go into a foster care program during this reunification or will be able to immediately go to their father.* The primary care of the children will not be changed at this time, however, *the children will spend their summer vacation with their father in Elko.*

(Emphasis added.)

Along with two other justices of this court, and on the same day that the petition was filed in this court, I signed an order granting Kelly's request for an emergency stay. That order also directed the father of the three children involved, real party in interest Mark Quintin Lewis (Mark), to file an answer to the petition. My immediate concern was that the district court had ordered three evidently apprehensive minor children to be removed from a stable home environment in California—where they have been well cared for by Kelly and where they have an extended support system—and sent to Elko, Nevada, for the summer—where they could be placed *in foster care* while they were being reintroduced to a father with whom they have had minimal contact in the past eight years. Nothing subsequently presented in the documents and the oral argument before this court has alleviated my initial, immediate concern.

Kelly alleged in her petition that, after her divorce from Mark in 1988, she married Howard Durler, an active duty member of the United States Military. With Mark's consent, and because of her new husband's military service commitment, Kelly and the children relocated to Florida in 1989. Later, they relocated again to Idaho and Virginia for brief periods. In 1993, Kelly, who by then had two additional children by Howard Durler, moved to Palm Desert, California, where she and her now five children continue to reside. The three children that are the subject of the instant custody and visitation dispute have not lived in Nevada, nor have they had any significant contact with this state for what is now a period of over eight years.

In her petition, Kelly does not oppose a "graduated process of re-introduction overseen by a licensed clinical children's psychologist." She observes that exactly such a process was proposed in an August 1994 report to the district court by Frank Hall, the court-appointed clinical social worker from Elko, Nevada. As noted, Hall's August 1994 recommendations are set forth in footnote 1 of the Majority Opinion. Kelly complains, however, that despite the near total absence of material compliance with any of Hall's August 1994 gradual reintroduction recommendations, and without having ever conducted any formal evidentiary hearing of any kind in open court, the district court has ordered

what is "tantamount to a temporary change of custody for the entire summer."

It appears clear that the district court ordered the summer-long visitation in Elko despite the fact that Hall's 1994 proposal for a gradual process of reintroduction in California, to be overseen by a licensed clinical children's psychologist, *has never been implemented or followed.* Instead, based on the documents on file before this court and the representations of counsel at oral argument, it is apparent that the district court has abandoned the initial proposals made by Hall in 1994, and has embarked upon a new plan of action which includes the possibility that the children will be committed to foster care while they are being reintroduced to their father.

Under Hall's August 1994 plan: (1) Mark was to have had a series of initial contacts and meetings with the children in California; (2) those meetings were to have been carefully monitored and supervised in California by Dr. Laskow, a licensed California clinical children's psychologist; (3) the in-person visitation was to occur in an arena in which the children would feel safe; and (4) when Dr. Laskow felt that the children's comfort level was sufficient to allow visitation with their father and stepmother in Elko, the Elko visit was to have been supervised by an experienced mental health professional. *See* Majority Opinion, at 2-3, n. 1. This closely monitored gradual reintroduction plan was expressly proposed by Hall as a means of overcoming what Hall himself described in his August 1994 report as "real" fears and apprehensions that the children have developed of their father.[1]

On September 29, 1994, the district court entered an order stating: "it is HEREBY ORDERED that the re-acquaintance period between [Mark] and the children should be accelerated such that Dr. Laskow and Mr. Hall should have these children ready to begin monitored supervision in Elko within ninety (90) days from the date of this order." Such a supervised contact in California between Mark and the children was arranged for November 11, 1994.

In an affidavit filed in this court on June 19, 1995, Hall states: "I contacted the facility where Dr. Laskow had worked and found that he was no longer there and had left under something other

---

[1]Hall's report states:

All of the children are exceedingly clear in describing their anxiety and concerns about the prospect of being returned to their father's care. Although it is difficult to gauge to what degree this apprehension is the product of "coaching" by others, it is the opinion of this observer, as well as Dr. Laskow, that the concerns and fears of the children are real, whatever their origins.

than normal circumstances."[2] Hall further avers that he "contacted the facility [where Dr. Laskow had worked] and was informed that no-one could do an after hours visitation facilitation;" that he thereafter arranged for someone other than Dr. Laskow—whose qualifications as a clinical child therapist are not specified by Hall—to "meet with the children prior to [Mark's] arrival and to then also meet with the children and [Mark] on Friday, November 11, 1994." Nonetheless, Hall reports that neither this contact, nor any other supervised visitations ever took place.[3] Thus, no carefully monitored visitations have ever occurred, and no licensed California child therapist has ever determined that the children's "comfort level is sufficient to allow visitation with their father and step-mother in Elko." Moreover, there is nothing in any of the documents before this court indicating that the court-ordered summer-long visitation in Elko will be supervised by "an experienced mental health professional."

In light of the above, it appears clear that the district court has abandoned the reunification plan set forth in Hall's 1994 report. It also clearly appears that the district court is presently adhering to a new reunification plan which permits Hall to make a determination as to whether the children should be immediately sent to live with their father for the summer or placed in a foster care program in Elko for some unspecified period.

More specifically, I note that, on June 19, 1995, the district court entered a "Supplemental Order With Findings," concluding that the children should "go for their summer visitation with their father." In addition, the district court expressly found that its

---

[2]Hall also states in this affidavit that he now finds "the findings of Dr. Laskow suspect." He does not elaborate on this statement. Nor does Hall explain if he has altered *his* opinion, expressed in *his* report of August 1994, that "the concerns and fears of the children [for their father] are real, whatever their origins." In any event, I note that Kelly poses an interesting question respecting the competency of a social worker to challenge the findings of a licensed psychologist.

[3]Hall's affidavit indicates that these meetings did not take place because of last minute changes of plan by Kelly. There is much in the documents before this court to indicate that Kelly may not have been solely or unreasonably responsible. At the oral argument before this court, Kelly's counsel complained that, although he was prepared to present evidence and cross-examine witnesses, no formal evidentiary hearing was ever conducted by the district court respecting whether Kelly unreasonably impeded any scheduled visits. Even assuming that Kelly was solely and unreasonably responsible for any failed visitation attempts, however, I suggest that such recalcitrance does not justify abandonment of measures designed to promote the best interests of the children. Uprooting apprehensive children and sending them to Elko for the summer, where they may be committed to a foster care program, will do little in my view to overcome the *real* anxieties and fears that the children have of their father.

"carefully monitored reintroduction program through Frank Hall is still in place and ready to begin through his offices." However, the district court also found:

> Mark Quintin Lewis already *has* an established summer visitation schedule by reason of a stipulation between the parties in 1988 which allowed [Kelly] to move with the children subject to certain other requirements such as keeping their father advised of their whereabouts. Because he has summer visitation, this Court considers that provision to be the in-place *rule* governing this case.

(Original emphasis.)

Obviously, the reference in this order to the "in place" "carefully monitored reintroduction program through Frank Hall," is *not* a reference to Hall's "carefully crafted" August 1994 recommendations, the recommendations cited in footnote 1 of the Majority Opinion. The plan that the district court now has "in place" appears to have been stated quite plainly by the district judge in his oral ruling of June 2, 1995, when the judge announced that, after the children arrive in Elko, "[i]t will then be determined whether or not the children need to go into a foster care program during this reunification or will be able to immediately go to their father."[4]

My reading of this record indicates that the district court has now concluded that a summer-long visitation must proceed without any material compliance with Hall's August 1994 recommendations. Moreover, despite the lack of any prior adherence to Hall's 1994 reintroduction recommendations, it appears that the district court has concluded that the children must now be removed to Elko for a summer-long visitation, where they could very well wind up in a foster care program. It seems quite clear to me that this is now the "in-place" "carefully monitored reintroduction program" to which the district court intends to adhere.

Indeed, it appears that the district court has concluded that a clinical social worker from Elko, Nevada, who has apparently only met with the children briefly on *one* prior occasion, will determine whether the children *"need to go into a foster care program during this reunification or will be able to immediately go to their father."* I simply cannot countenance returning this matter to the jurisdiction of the Nevada district court, where the reintroduction plan under which the district court is now proceeding appears to include the possibility that young, apprehensive children will be taken from a stable, supportive environment with

---

[4]My conclusion in this respect is reinforced by the remarks of counsel at oral argument.

their mother and placed in foster care. I find such an arrangement to be wholly unacceptable.

In sum, Hall initially designed a gradual, carefully supervised reintroduction plan as a means of decreasing the "real" anxieties and fears of the children for their father. Hall wrote that such a reintroduction process "would ensure that the children will not suffer further trauma, and, through the involvement of Dr. Laskow, provide a mechanism to deal with whatever may have happened in the past, in addition to protecting the rights of each parent to have meaningful contact . . . ." Despite the "real" anxieties, apprehensions, and trauma from which the children suffer, the record reflects that: (1) no gradual, supervised, initial contacts *of any kind* between the children and their father occurred prior to the district court's June 2, 1995, decision to compel the children's summer-long visitation in Elko; (2) Dr. Laskow was not and is not now available to supervise any such initial contacts; (3) no licensed California clinical child psychologist has ever made a determination that the children's comfort level is sufficient to allow for visitation with their father and stepmother in Elko; (4) the district court has abandoned the gradual reintroduction process set forth in Hall's 1994 report and does not now intend to require any initial contacts supervised by a licensed clinical child psychologist in California prior to subjecting the children to a lengthy, possibly traumatic separation from their mother, their other siblings, and the extended family and social support system they now have in California; and (5) no "experienced mental health professional" has been named to supervise the children during the Elko visitation ordered by the district court. Quite to the contrary, it appears that the district court's current plan is to compel the children to go directly to Elko, where Hall will determine whether the children need to go into foster care during the reunification with their father or will be able to immediately go to their father.

The district court and Hall have evidently abandoned key elements of the initial plan and have elected to proceed instead without the "carefully crafted" guarantees that the Majority Opinion cites approvingly in footnote 1. I fear that the majority's decision is based, in part at least, on a misconception that the plan it cites approvingly in footnote 1 remains in place, and that no forced visitation will occur until there has been compliance with the recommendations in that plan. I also fear that whatever plan does remain in place includes an arrangement for placing the children in foster care during a summer-long reintroduction to their father. I am hard pressed to imagine an arrangement which would do more to exacerbate, rather than relieve, what Hall has defined as "real" fears and anxieties of the children for their father.

## JURISDICTION UNDER THE UCCJA

Even if I could be reassured that the district court intends to adhere to Hall's August 1994 reintroduction plan, I cannot join in the Majority Opinion because its holding does not conform to the letter or the spirit of the UCCJA. The threshold issue is whether NRS 125A.050 provides a basis for the Nevada district court to exercise jurisdiction over Mark's motion for a change in custody. In my view, it does not.

The majority concludes that the respondent district court has properly assumed jurisdiction over this dispute under NRS 125A.050(1)(b).[5] The respondent court may exercise jurisdiction under NRS 125A.050(1)(b) if it is in the best interest of the children for the court to do so because: (1) the children and their parents, or the children and at least one contestant, "have a significant connection with this state;" and (2) "[t]here is available in this state substantial evidence concerning the children's present or future care, protection, training and personal relationships." In my view, there are far more *significant* California contacts and there is far more *substantial* evidence in California concerning the children's care, protection, training and personal relationships. For example, in Hall's August 1994 report, we are told the following facts.

Kelly is employed near Palm Desert, California, where she lives with the children in a "quite comfortable" home. The two boys, now 11 and 12 years old, sleep in bunk beds on a "spacious, enclosed porch." The parties' 14-year-old daughter has "her own room which is well furnished." Kelly's sister, a physical therapist, and her sister's husband "play a very important supportive role in the lives of [Kelly] and her children." The children's aunt provides after-school care to the children. They ride the school bus to their aunt and uncle's home after school, and Kelly picks them up there when she gets off work.

Hall has made *one* trip to California to interview the children.

---

[5]It is clear that NRS 125A.050(1)(b) provides the *only* possible basis for arguing that the Nevada district court *may* assume jurisdiction. None of the other grounds listed in that statute are even remotely applicable. In particular, Nevada was not the home state of the children at the time of the commencement of this proceeding. Therefore, Nevada jurisdiction cannot be premised on the "home state" grounds as provided in NRS 125A.050(1)(a). The children have not been abandoned, threatened with mistreatment or abuse or otherwise neglected. Thus, Nevada jurisdiction cannot be premised on any emergency as provided under NRS 125A.050(1)(c). As the majority concedes, the children "have significant connections to the State of California." Indeed, it appears that California clearly has jurisdiction under NRS 125A.050(1)(a) or (b). Thus, jurisdiction cannot be premised on the ground that "no other state would have jurisdiction" as provided in NRS 125A.050(1)(d).

He was unable, however, to interview the daughter personally because of school activities, sports, and a medical appointment. Instead, his only contact with the daughter has been a single telephone conversation. During this conversation, the young girl appeared "very articulate," quite aware of the purpose of the conversation, and "very clear in her wish that she and the boys not have to see or talk to their father."

Hall's *one* personal interview with the boys took place "in the neutral environment" of the boys' school "in the presence of a trusted school counselor." During the interview, the older boy "became quite tearful and asked the school counselor if '[Hall] was going to make us go to my father?'" The younger boy expressed "mixed feelings" about seeing his father again.

As Kelly argues, the psychologists, teachers, doctors, friends, and relatives who are *most* familiar with the children all reside in California. Kelly's contention is clearly and convincingly supported by Hall's report. For more than one-half of their lives, the children have had little or no contact with Nevada or with their father. They have no friends or school-mates in Nevada, nor do they attend school in Nevada. Rather, they attend school in California where they participate in sports activities. California is where their mother, their other siblings, and the relatives with whom they have closest relationships all reside. All of their teachers, "trusted school counselors," doctors, and friends reside in California, not Nevada.

In stark contrast to these extremely significant California contacts and the abundant evidence in California concerning the children's *present and future* situation, the majority is only able to say: (1) that the children previously resided in Nevada; (2) that the children's father has been and plans to remain a Nevada resident; (3) that the children were all born in Nevada; (4) that the parents previously litigated custody issues in Nevada; and (5) that the parents are presently subject to the 1988 Nevada district court custody order. The majority also concludes that the district court's "keen understanding of the issues" and Hall's presence in Nevada support a finding that there is substantial evidence in this state concerning the children's present and future care, protection, training and personal relationships. I cannot agree that jurisdiction can be tied to Nevada with such slender threads.

In contrast to the abundant and substantial evidence in California, there is little or no evidence available in this state concerning the children's *present or future* situation. The factors cited by the majority primarily relate to the children's distant *past*. The district court last revised the custody decree in August 1988. At the time Mark filed his motion for a change in custody, the district court had no recent knowledge respecting the children's present

or future situation. Any knowledge or evidence before the district court regarding the children's present or future situation was acquired *after* the district court assumed jurisdiction. Most of that knowledge and evidence was gathered by Hall, who visited *one* time with the boys *in California* and had *one* telephone conversation with the daughter *after* he was appointed by the district court to prepare a report.

The UCCJA seeks to promote cooperation with the courts of other states to the end that a custody decree is rendered *in that state which can best decide the case in the interest of the child,* and to assure that child custody matters are ordinarily litigated "in the state with which the child and his family have the *closest connection* and *where significant evidence concerning his care, protection, training and personal relationships is most readily available.*" *See* NRS 125A.020(3) (emphasis added). The courts of this state should "decline the exercise of jurisdiction when the child and his family have a closer connection with another state." *Id.* Pursuant to these policies, California is clearly the jurisdiction that can better decide this dispute in the best interests of the children. The majority's contrary finding completely fails to acknowledge or promote any of these general policies.

The case of Sholty v. Carruth, 616 P.2d 918 (Ariz. Ct. App. 1980) is virtually on point. There, the parents of three minor children lived and were divorced in Ohio in 1976. The mother, who was awarded custody, moved to Arizona in 1977 where she lived with the children. In 1980 the father sought visitation rights in Ohio that resulted in an order (the mother was represented by counsel) granting the father visitation that included a seven-week period with the children in Ohio. Insetting aside the Arizona superior court's full faith and credit deference to the Ohio order, the Court of Appeals noted that Arizona, like Ohio, had adopted the UCCJA, and that the Act provides two major bases for jurisdiction: "(1) the child's home state or (2) the state having a significant connection with the child and his family." *Id.* at 919. The *Sholty* court observed that Ohio was not the home state of the children, and that although the father had a significant connection to Ohio, the children did not. The only family tie the children had in Ohio was the father, with whom they had no contact. The father had filed the motion in Ohio in an effort to reestablish a relationship with his children. The *Sholty* court concluded that:

> The uniform act generally concerns subject matter jurisdiction and not jurisdiction over the parties. Consequently petitioner, by stipulation, could not confer upon the Ohio court jurisdiction which it did not have over the subject matter of visitation. Arizona is the children's home state and the Ohio order was not binding upon the respondent court. It

therefore should not have declined to exercise jurisdiction over the visitation issue.

*Id.* (citation omitted).

The instant case is far more compelling than *Sholty.* The three children here have had minimal contact with their father for *eight* years, and, like the Sholty children, have expressed substantial anxiety over the prospect of having to spend lengthy periods of time with their father. California is the home state of the Lewis children, and the state where the children have extended family, friends and feelings of security. In contrast, it appears that Nevada has no meaningful relationships for the children with the exception of the father and perhaps eventually, the stepmother. And, as previously noted, the father has had only minimal contact with the children over the past eight years. There is simply no basis for the district court in Nevada to assume jurisdiction over the children, and to do so contravenes both the letter and the spirit of the UCCJA.

Although I view a finding of jurisdiction in Nevada to be wholly insupportable, I note that even if jurisdiction could be found to reside in this state, the district court should have declined to exercise that jurisdiction pursuant to the provisions of NRS 125A.070. Where it appears that a court of another state would be a more appropriate forum, that provision permits a court of this state to decline to exercise jurisdiction. *See* NRS 125A.070(1) and (2). In making such a decision, the court may consider whether another state has "home state" jurisdiction, whether another state has a closer connection with the children, whether substantial evidence concerning the children's present or future situation is more readily available in another state, and whether the exercise of jurisdiction by a court of this state would contravene any of the policies I have noted above that are set forth in NRS 125A.020. *See* NRS 125A.070(3).

Moreover, NRS 125A.070 also provides:

4. Before determining whether to decline or retain jurisdiction the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by the more appropriate court and that a forum will be available to the parties.

5. If the court finds that it is an inappropriate forum and that a court of another state is a more appropriate forum, it may dismiss the proceedings, or it may stay the proceedings upon condition that a custody proceeding be promptly commenced in another named state or upon any other conditions which may be just and proper, including the condition that a

moving party stipulate his consent and submission to the jurisdiction of the other forum.

I remain hopeful that the district court may yet utilize these provisions to effectuate an appropriate transfer of this matter to the jurisdiction of the California courts—the courts that are clearly in the better position to decide this matter in the best interests of the children.

## CONCLUSION

I do not wish to convey an impression that I oppose a gradual reunification of the children with their father. From my understanding of the facts, it appears that reunification will be in the best interests of all concerned. My position is simply that it is clearly not in the best interests of the children for the Nevada district court to retain jurisdiction over this matter, or to proceed with the reunification plan that is apparently now in place. Under no circumstances could I condone placing the children in foster care. I would grant Kelly's petition and issue a writ commanding the district court to dismiss the action on the condition that an appropriate proceeding be promptly commenced in California. Therefore, I respectfully dissent.